AGRO SCIENCE COMPANY, BAVARO INVESTMENT COMPANY, TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Agro Science Co. v. Commissioner
Docket Nos. 22313-86; 22687-86; 22755-86
United States Tax Court
T.C. Memo 1989-687; 1989 Tax Ct. Memo LEXIS 687; 58 T.C.M. (CCH) 1093; T.C.M. (RIA) 89687; December 28, 1989
Ronald M. Mankoff, G. Tomas Rhodus, and Brett B. Flagg, for the petitioners. Pamela V. Gibson, Judy Jacobs, and Kathleen E. *688 Whatley, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: In these consolidated cases the Commissioner determined adjustments to the 1982 and 1983 Federal partnership returns for the Agro Science Company ("Agro"), R&D Partners - 82 ("RDP"), and Alfa Medical Research Associates ("Alfa") by denying deductions as follows: Agro
1982
R&D expense
$ 593,353.29
Accounting fees
4,000.00
Interest
142.03
$ 597,495.32
1983
Accounting fees
$   4,000.00
Interest
22,162.50
$  26,162.50
RDP
1982
R&D expense
$ 600,000.00
Accounting fee
3,400.00
Management fee
900.00
Postage & office expense
91.86
Interest
1,150.68
$ 605,542.54
1983
Accounting fees
$   3,400.00
Administrative fees
900.00
Postage & office expenses
22.39
Interest
21,470.46
$  25,792.85
Alfa
1982
R&D expense
$ 577,167.80
Accounting fees
2,500.00
Administrative fees
3,150.00
Interest
1,150.00
$ 583,967.80
1983
Accounting fees
$   2,500.00
Administrative fees
2,500.00
Amortization
205.00
Interest
21,470.46
$  26,675.46
*689 Timely final partnership administrative adjustments were received by petitioner Bavaro Investment Company, tax matters partner for Agro, petitioner Donald Spear, tax matters partner for RDP, and petitioner Marc Geller, tax matters partner for Alfa. The issues we must decide are: (1) whether the partnerships' notes to Coral Sociedade Brasileira de Pesquisas e Desenvolvimenta, Ltd. ("Coral") are valid indebtedness; (2) whether the partnerships incurred research and development expenses pursuant to section 174; [2] and (3) whether the research and development agreements at issue with Coral were entered into with a profit objective. FINDINGS OF FACT The principal place of business of each partnership was in Texas at the time the petitions were filed in these cases. The partnerships were organized to engage in research and development activities in connection with the development, production, licensing, and marketing of diagnostic health care products utilizing monoclonal antibody conjugates. To accomplish these purposes, Agro, RDP, and Alfa (collectively, *690 the "Partnerships") entered into research and development agreements with Coral. In 1982 Mr. Allen Campbell formed Coral under the laws of Brazil. Gwynfor R. Williams assisted Campbell in setting up the Coral programs. As of March 1982, Campbell owned 99.875 percent of Coral through Inpro, a Netherlands holding company, owned and controlled by Campbell. Campbell holds a law degree and is the founder and sole shareholder of A. F. Campbell & Co., Inc. ("Campbell & Co."), a corporation formed under the laws of Texas. Campbell formed Coral to perform the laboratory work needed to make monoclonal antibody conjugates for the Partnerships. Coral had limited laboratory facilities and offices in Sao Paulo, Brazil. No meaningful research or development activities for the Partnerships took place in the Sao Paulo offices. The laboratory work that is the subject of this litigation was performed in Coral's laboratory facilities in Cambridge, England. The staff and equipment in Cambridge were competent and adequate to perform the monoclonal antibody research contracted for by the Partnerships. The laboratory included animal facilities, cell culture facilities, bacterial facilities, immunology *691 facilities, microbiology facilities, and facilities for the purification of antibodies. Dr. Fred Stark was employed by Coral to set up and manage the Coral laboratory. He had been Assistant Chief of Medicine and Chief of Infectious Disease Service at Letterman Army Medical Center, Associate Clinical Professor of Medicine at the University of California, and a Fellow in Infectious Diseases and Immunology at Walter Reed General Hospital. The full-time researchers at the Coral laboratory in Cambridge included among others, Bruce Wright, who had worked as senior research officer in charge of the tissue culture facilities of Dr. Milstein who had been awarded a Nobel Prize for the discovery of monoclonal antibodies. By late 1984, Coral employed approximately 100 people. Coral sold approximately 170 monoclonal antibody production projects to United States investment groups and succeeded in producing monoclonal antibody conjugates for approximately 70 percent of the projects undertaken. An antibody is a disease fighting component found in the body. When a human's body is invaded by a pathogen (e.g., a bacterium or virus), the body normally responds by making a variety of antibodies *692 to destroy the invading organism by binding to the antigens of the organism. Each monoclonal antibody developed by Coral was a laboratory copy of an antibody designed to bind with a single antigen of an organism. The source of antibodies is B-lymphocytes ("B-cells"). B-cells cannot grow in culture; so to produce a monoclonal antibody, a B-cell producing a particular antibody is fused with a cancer cell (a myeloma). The cancer cell confers the ability to grow permanently in cell culture and to support unlimited antibody production. The B-cell contributes gene coding for the specific antigen to which the antibodies will react. The fused B-cell and cancer cell is called a "hybridoma." In general, the steps of Coral's production of monoclonal antibodies were as follows: (1) obtain a purified antigen, a potentially toxic substance; (2) inject the purified antigen into a laboratory mouse to invoke an immune response in the mouse (usually through the release of B-cells into the blood) directed to a particular antigen; (3) sacrifice the mouse and fuse the sacrificed mouse's antibody-producing cells with a cancer cell to form the hybridomas; (4) place the resulting hybridomas in a cell *693 culture medium for growth or cloning; and (5) test the resulting clones for production of the desired antibody. Each antibody in a mouse has several subclasses of antibody. Coral produced a single subclass of each monoclonal antibody. Coral would then conjugate the monoclonal antibody. "Conjugation" of a monoclonal antibody refers to the process of coupling the antibody with a substance which allows the antibody to produce a "signal." A monoclonal antibody conjugate is a monoclonal antibody linked to a label or tag, such as an enzyme, capable of providing a signal (such as a simple color change) which indicates a particular antigen/antibody reaction. The Partnerships hoped that a conjugated monoclonal antibody particular to a specific antigen would have potential usefulness (either alone or in combination with other antibodies) in connection with human or animal diagnostics, epidemiology, serological classification or identification, animal therapeutics, and general medical and scientific research. Coral maintained laboratory notebooks for each monoclonal antibody project at issue. The lab books were divided into sections and contained blank forms to fill in with the project *694 results. The lab books were not complete. Most of the forms were not filled in. Some sections contained only pages of computer printouts with no explanation. On October 23, 1982, November 29, 1982, and December 23, 1982, Agro, RDP, and Alfa, respectively, were formed as general partnerships under the laws of Texas. The partners contributed to their respective partnerships cash and nonnegotiable, non-interest-bearing demand promissory notes as follows: Agro
Initial
Ownership
Name
Capital Contribution
Interest
Thomas L. Lee
$ 3,450 cash
$ 31,050 note
4.00%
R. R. Finham
3,450 cash
31,050 note
4.00%
Howard Smith
3,450 cash
31,050 note
4.00%
Mameco
3,450 cash
31,050 note
4.00%
Black Gold Prts.
17,250 cash
155,250 note
20.00%
Jo Bar Investments
3,450 cash
31,050 note
4.00%
Joe McQueary
3,450 cash
31,050 note
4.00%
David Haman, D.O.
3,450 cash
31,050 note
4.00%
Walter A. Dobson, D.O.
3,450 cash
31,050 note
4.00%
Martin Griebat
17,250 cash
155,250 note
20.00%
Bavaro Investments
3,450 cash
31,050 note
4.00%
Jesse Lyons
3,450 cash
31,050 note
4.00%
Marvin Jones
3,450 cash
31,050 note
4.00%
Jack Grossman
3,450 cash
31,050 note
4.00%
Donald P. Brotherman, M.D.
3,450 cash
31,050 note
4.00%
Brent Blonkvist, M.D.
3,450 cash
31,050 note
4.00%
Barry Morgan
3,450 cash
31,050 note
4.00%
*695 RDP
Initial
Ownership
Name
Capital Contribution
Interest
James E. West
$ 3,269 cash
$ 25,500 note
4%
Robert Winn
3,269 cash
25,000 note
4%
Gary Bergman
4,342 cash
34,000 note
5-1/3%
Ruth Hester Sutton
3,269 cash
25,500 note
4%
Reynaldo Perez, M.D.
5,415 cash
42,500 note
6-2/3%
Thomas Hennessy
7,561 cash
59,500 note
9-1/3%
Edward J. Bach
5,415 cash
42,500 note
6-2/3%
Everett M. Davis
3,269 cash
25,500 note
4%
Danny C. Wash
3,269 cash
25,500 note
4%
Donald D. Spear
1,073 cash
8,500 note
1-1/3%
W. C. Ferrill, III
5,415 cash
34,000 note
6-2/3%
Ellis R. Hardin
4,342 cash
34,000 note
5-1/3%
Roy Wm. Jenkins
4,342 cash
25,500 note
5-1/3%
Ben S. Skinner
3,269 cash
25,500 note
4%
James R. Magee
3,269 cash
25,500 note
4%
B. H. Sirmons
10,780 cash
85,000 note
13-1/3%
Robert Markovich
3,269 cash
25,500 note
4%
Paul H. DeGroat
3,269 cash
25,500 note
4%
Gordon Lillie, M.D.
3,269 cash
25,500 note
4%
Alfa
Initial
Ownership
Name
Capital Contribution
Interest
Derby Producing Co.
$ 31,398.00 cash
$ 313,980.00 notes
35.39%
Alan Faden
14,666.66 cash
146,666.60 notes
16.53%
Marc Geller
14,666.66 cash
146,666.60 notes
16.53%
Bill J. Sitzes
14,666.66 cash
146,666.60 notes
16.53%
Marion & Lura
13,327.00 cash
133,270.00 notes
15.02%
Griffin
*696 The Articles of Partnership for Agro and RDP delegated the administration of the day-to-day affairs and ministerial acts necessary to conduct partnership business to Bavaro Investments Partnership and Donald Spear, respectively. Donald Spear was the tax matters partner for RDP and also was a salesman for Coral. On December 23, 1982, Alfa entered into an agreement with Medical Research Funding, Inc., d/b/a Houston Research Associates ("HRA") to assist in managing and administering partnership business. The agreement for these services was signed on behalf of HRA by Mr. S. M. Neider. In December 1982 the Partnerships entered into similar research and development agreements with Coral. The research agreements were identical except for the date, the consideration denominated in Brazilian new cruzeiros (NCr$ , hereinafter "cruzeiros"), and the product description. Pursuant to the agreements, Coral was to diligently conduct for 12 months or until completion of the project, whichever first occurred, the "research and experimentation" necessary for the development of a particular monoclonal antibody conjugate. The agreements did not require that Coral produce more than one subclass *697 of the monoclonal antibody or specify which subclass of monoclonal antibody Coral would produce. Coral at its option could extend the term of the agreement with each partnership for two additional 12-month periods. The research agreement between Agro and Coral describes the product to be developed by Coral as: A conjugate of Alkaline phosphatase and a monoclonal antibody which is produced by a single mouse/mouse hybrid cell line and which combines specifically in an immunological manner with the characteristic antigen of Escherichia coli K99. In exchange, Agro agreed to pay Coral NCr$ 148,920,000 for its services, payable one-eighth in cash upon the execution of the Agreement and seven-eighths by execution and delivery of a Promissory Note ("Research Note"). The research fee to be paid to Coral by Agro, denominated in Brazilian cruzeiros, was equivalent to approximately $ 600,000 in United States currency using the exchange rate printed in the Wall Street Journal on December 30, 1982, the day the contract was signed. Agro paid $ 75,000, the cash portion of the purchase price, on December 30, 1982. The Research Note dated December 30, 1982, was in the face amount of NCr$ *698 130,305,000 with interest at 10 percent per annum. On January 31, 1983, Coral assigned the Research Note to M.R.T. Medical Research Trust ("MRT"), a Liechtenstein trust the beneficiaries of which were employees of Coral including Dr. Fred Stark and Gwyn Williams. The research agreement between RDP and Coral describes the product to be developed by Coral as: A conjugate of Alkaline phosphatase and a monoclonal antibody which is produced by a single mouse/mouse hybrid cell line and which combines specifically in an immunological manner with the characteristic antigen of Shigella K7. Coral subsequently redesignated the target antigen as Shigella boydii OC7, in a memorandum dated December 2, 1983. RDP agreed to pay Coral NCr$ 144,270,000 payable one-eighth in cash upon execution of the agreement and seven-eighths by execution and delivery of a Research Note. The research fee to be paid to Coral by RDP, denominated in Brazilian cruzeiros, was equivalent to approximately $ 600,000 in United States currency using the exchange rate printed in the Wall Street Journal on December 23, 1982, the day the contract was signed. RDP paid $ 75,000, the cash portion of the purchase price, *699 on December 23, 1982. The Research Note dated December 23, 1982, was in the face amount of NCr$ 126,236,250 with interest of 10 percent per annum. On January 31, 1983, Coral assigned the Research Note to MRT. The research agreement between Alfa and Coral describes the product to be developed by Coral as: A conjugate of Alkaline phosphatase and a monoclonal antibody which is produced by a single mouse/mouse hybrid cell line and which combines specifically in an immunological manner with the characteristic antigen of Pseudomonas aeruginosa 6. In exchange Alfa agreed to pay Coral NCr$ 144,270,000 payable one-eighth in cash upon execution and delivery of a Research Note. The research fee to be paid to Coral by Alfa, denominated in Brazilian cruzeiros, was equivalent to approximately $ 600,000 in United States currency using the exchange rate printed in the Wall Street Journal on December 23, 1982, the day the contract was signed. Alfa paid the $ 75,000 cash portion of the purchase price on December 27, 1982. The promissory note executed on behalf of Alfa on December 23, 1982, was in the face amount of NCr$ 126,236,250 with interest of 10 percent per annum. On January 31, 1983, Coral *700 assigned the Research Note to MRT. The Research Notes in favor of Coral from Agro, RDP, and Alfa paid an interest rate of 10 percent annually, and had no actual payments due for the first 7 years. One-fourth of the principal of the Research Notes plus interest accrued on that portion of the principal was due in 1989, 1990, 1991, and 1992, respectively, prepayable if there were proceeds from commercialization of the product. These liabilities of Agro, RDP, and Alfa were not indexed for inflation, or linked to the exchange rate of any currency, including the U.S. dollar. In 1982 when the Partnerships were formed and the liabilities were made in favor of Coral, Brazilian currency was undergoing hyper-inflation and devaluation against the dollar. From 1974 to 1978, inflation in Brazil averaged 38 percent annually. The rate reached 77.2 percent in 1979, 110.2 percent in 1980, 95.2 percent in 1981, and 99.7 percent in 1982. Based on the persistently high inflation rate in Brazil, an international debt crisis inaugurated by Mexico's announcement that it was unable to meet payments due on its external debt in August of 1982, and permissive wage indexation in Brazil, the consensus *701 forecast of the performance of the Brazilian economy predicted that the annual rate of inflation would remain high while declining modestly to 87 percent in 1983, 80 percent in 1984, and 75 percent in 1985 and 1986. See International Economic Analysis, Latin American Economic Outlook: Brazil (Washington, D.C. December 1982), p. 5. The average projection of approximately 40 private forecasters surveyed every month by the Blue Chip Economic World Scan newsletter expected inflation of 88 percent in Brazil for 1983, as reported in the December 15, 1982, issue. The same group predicted on average that Brazil's inflation would run at 79 percent in 1984, 74 percent in 1985, 65 percent in 1986, 64 percent in 1987, and 59 percent in 1988. The promoters of the Partnerships, as well as many of the investors, were aware of these predictions of Brazil's inflationary economy. Over the decade ending in 1982, both interest rates and the exchange rate of cruzeiros/dollars in Brazil tended to rise with inflation. [3] In 1982 investment banks were lending money at 8.5 percent monthly, or 166 percent per annum. Automobile purchasers paid interest up to 9.2 percent monthly or 197 percent annually. *702 Depositors in the Letra de Cambio were receiving 7.25 percent monthly on their deposits during the first week of December 1982 while bank certificates of deposit were paying 7.6 percent monthly or 140 percent per annum. After years of high inflation, the standard practice in Brazil for all but very short-term debt was to incorporate monetary correction or indexation clauses into financial contracts. Making long-term loans in cruzeiros with nominal interest rates and no monetary correction or indexation clause like the Research Notes executed on behalf of Agro, RDP, and Alfa in favor of Coral was not a normal business practice for transactions in 1982. Subsequent to 1982, inflation was far worse than predicted in December of 1982. Brazil's inflation rose to the range of 210-235 percent annually *703 in 1983-1985 while the interest rates and cruzeiro/dollar exchange rate increased accordingly. [4] In 1986 the Brazilian government launched the Cruzado Plan replacing the cruzeiros with the cruzado at 1,000 to one and freezing all prices and wages to halt inflation in Brazil. The result was an annual inflation rate of about 65 percent through 1986 and serious product shortages, excess demand, and a large fiscal deficit. The annual inflation rate soared to over 1,000 percent in the early months of 1987. By the end of 1987, inflation had receded to its normal monthly rate of about 10 percent. *704 Assuming an annual inflation rate of 87 percent in 1983, 80 percent in 1984, and 75 percent thereafter (as predicted by some economic forecasters in late 1982), the dollar amounts that would be required to make payments to Coral on the Research Notes were $ 3,840 in 1989, $ 2,330 in 1990, $ 1,400 in 1991, and $ 840 in 1992. [5] In fact, the Brazilian currency had so depreciated that on January 19, 1988, each partnership could have satisfied its debt to Coral by payment of $ 184. RDP and Alfa entered into Evaluation and Option Agreements with Technology License Company, Ltd. ("TLC") dated May 16, 1984, and September 30, 1985, respectively. TLC was originally owned by Inpro, Campbell's wholly *705 owned corporation. Later, Murex Corporation of Norcross, Georgia ("Murex") acquired TLC. Murex was founded by Campbell, who is the controlling shareholder. The license agreements gave TLC, (1) a nonexclusive right to manufacture, distribute, use, and sell the monoclonal antibody conjugate for 15 months to evaluate the marketability of the conjugates, and (2) a right of first refusal after evaluation to acquire each partnership's right, title, and interest in the conjugate. RDP and Alfa were to receive two to four percent of the net sales price of each item of the product sold during the 15-month evaluation period. In the licensing agreements RDP and Alfa acknowledged their liability to MRT and authorized TLC to pay royalties to the trust until the liability on their notes had been satisfied. If TLC acquired RDP's or Alfa's interest in the conjugate at the end of the evaluation period, Alfa would continue to receive two to four percent of the net sales price of the products sold for 15 years. Agro and RDP entered into separate License Agreements with TLC dated December 23, 1985. RDP's License Agreement did not refer to its 1984 Evaluation and Option Agreement with TLC. The *706 License Agreements gave TLC, (1) an exclusive right to manufacture, distribute, use, and sell the monoclonal antibody conjugate, using a good faith effort, for 36 months to evaluate the marketability of the conjugates, and (2) the option to acquire Agro's and RDP's right, title, and interest in the conjugate. TLC agreed to pay each partnership an initial minimum royalty by executing a promissory note on the date of the License Agreement in the amount of NCr$ 120,000,000, payable in 3 years. TLC also agreed to pay each partnership a second minimum royalty 1 year from the date of the License Agreement by executing a similar promissory note in the amount of NCr$ 120,000,000, payable in 3 years. In addition, TLC agreed to pay the two partnerships three to five percent of the net sales price received for any products made from the conjugate, creditable against the minimum royalty amounts, during the evaluation period. TLC agreed to pay any amounts in excess of the minimum royalty to MRT in satisfaction of the Research Notes Coral assigned to MRT. The License Agreements provided that if TLC opted to acquire the title to the monoclonal antibody conjugates after the evaluation period, *707 TLC would pay three to five percent of the net sales price to the partnerships for 15 years. Agro and RDP both amended their License Agreements with TLC on the same date that they entered into the original agreements. The amended agreements were similar except (1) the royalty was reduced to two to four percent of net sales prices; (2) TLC had no obligation to commercialize the conjugates; (3) all right, title, and interest in the conjugates vested in TLC after it gave the Partnerships the second minimum royalty note; and (4) TLC's failure to make royalty payments would not affect its title to the conjugates. Also, on December 23, 1985, Agro and RDP each entered into a three-party agreement with TLC and Diagnostic Holdings Ltd. ("DHL"). DHL assumed TLC's obligations to the two partnerships, Agro and RDP released TLC from its obligations pursuant to the first contract, and TLC agreed to pay DHL the sums it would have paid the two partnerships pursuant to the amended contract. As of January 1988, no payments had been made on any of the Partnerships' Research Notes that Coral had assigned to MRT. Although provisional patent applications were filed by Agro, RDP, and Alfa covering *708 the research Coral had done for the Partnerships, no patents were granted. On May 20, 1985, Coral successfully completed for RDP development of a conjugate of alkaline phosphatase and a monoclonal antibody which combines in an immunological manner with Shigella boydii OC7. On November 27, 1985, Coral successfully completed for Agro the development of a conjugate of alkaline phosphatase and a monoclonal antibody which combines in an immunological manner with Escherichia coli K-99. On November 27, 1985, Coral successfully completed for Alfa the development of a conjugate of alkaline phosphatase and monoclonal antibody which combines in a immunological manner with Pseudomonas aeruginosa 6. The Coral projects had the stated goal of using monoclonal antibody conjugates to develop more rapid and accurate identification and diagnosis of disease in clinical laboratories, hospitals, and research laboratories, and in doctors' offices. The projects were set up and promoted to return more in Federal income taxes to each investor than any cash the investor would be required to invest. On one occasion Campbell stated that the Coral program was first and foremost a tax shelter and only secondarily *709 a money-making activity. During presentations concerning the Coral projects, Campbell would inform potential investors of a possible 8-to-1 deduction and low economic risk due to the high probability of the Brazilian cruzeiros' depreciation against the dollar. Moreover, potential investors received a history of the declining value of the cruzeiro. Agro, RDP, and Alfa at all times relevant maintained their books and records and filed their Federal income tax returns on the basis of a calendar year using the accrual method of accounting. The Partnerships elected to treat research and development expenditures as expenses not chargeable to capital accounts pursuant to section 174. The partners of Agro who testified at trial were Dr. Donald Brotherman, Martin Griebat, Allen Poe on behalf of Black Champ Enterprises, and Philip Robertson on behalf of Bavaro Investments. In the aggregate they held about 48 percent of the partnership interests in Agro. Dr. Brotherman is a physician specializing in opthalmology who owned a four-percent interest in Agro and interests in two other Coral partnerships. He learned about Agro from William Bailey, an accountant in the accounting firm of Bailey, *710 Vought and Robertson, in 1982. Martin Griebat is a self-employed designer of clinical machinery who designed a packaging machine for the partnership. He had invested in eight Coral partnerships which reduced his adjusted gross income by $ 734,936.94. Griebat could not remember at trial the names of the other Coral partnerships he had invested in. Allen Poe is a partner of Black Champ Enterprises which purchased a 20-percent interest in Agro. Black Champ Enterprises had invested in six Coral partnerships other than Agro. Poe did not know the names of the other Coral partnerships in which Black Champ Enterprises invested and did not know what research they did. Philip Robertson is a CPA and is a partner in the firm Bailey, Vought and Robertson. He is a partner in Bavaro Investments Company ("Bavaro") with Bailey and Vought. Bavaro owns a four-percent interest in Agro and is the partnership's tax matters partner. At trial, Brotherman, Griebat, Poe, and Robertson did not know their fellow partners and were not familiar with the financial status of their partners despite the fact that Agro was a general partnership and each of the partners were jointly and severally liable for *711 all partnership liabilities. The partners of RDP who testified at trial were Ben Skinner, Danny Wash, Ellis Hardin, Gary Bergman, James McGee, Paul DeGroat, Edward Bach, Ruth Sutton, Robert Winn, Thomas Hennessey, and Donald Spear. Ben Skinner, a program administrator at Texas Instruments heard about Coral from a friend and became a four-percent partner in RDP. Although he was familiar with the history of the declining cruzeiro, Skinner did no independent investigation into his investment in RDP, and was not familiar with Coral or the value of the services performed by Coral. Skinner did not know many of his fellow partners and was not familiar with their financial status even though he was jointly and severally liable with his partners for all partnership liabilities. Moreover, Skinner did not know what his share of RDP's liabilities was. Prior to his investment in Coral, Skinner had no experience or expertise with respect to medical research, manufacturing or marketing pharmaceuticals, or medical products. Since his initial investment, Skinner's partnership activities have consisted of attending one meeting, participating in several telephone conversations, and reading articles *712 about monoclonal antibodies, none of which he remembered at trial. Danny Wash is an attorney with a general practice who heard about Coral when Spear gave a presentation on a radio show. Spear was a salesman for Coral and also was the tax matters partner for RDP. Spear discussed the history of the cruzeiro devaluation with Wash, after which Wash purchased a four-percent interest in RDP. Prior to the trial, Wash had never seen the RDP Agreement, and he did not know who negotiated it on behalf of the partnership. Wash's understanding was that he was only liable for his percentage of the cruzeiro note to Coral, but he was not sure whether there was an agreement limiting his liability on the note. In 1982 Wash could not have paid off a $ 525,000 liability, and did not know who his other partners were besides Don Spear. Prior to his investment in Coral, Wash had no experience or expertise with respect to medical research, manufacturing, or marketing. He has never requested any information regarding the value of the services to be performed by Coral. He did not acquire any information about monoclonal antibody research and never investigated the possibility of commercial exploitation *713 of the research. Ellis Hardin is an Electronic Test Technician at Rockwell International. He has a college degree. He heard of Coral from Don Spear on the radio, and purchased a 5 1/3 percent interest in RDP. Spear advised Hardin that Coral would save him money on taxes. Hardin is not familiar with his other partners and had never spoken to any of them prior to the trial. At the time of trial he did not know the extent of the partnership liabilities. Prior to investing in RDP, Hardin had no experience or expertise with respect to medical research, and he did not try to inform himself about the research that was going to be done by Coral. Since he invested in Coral, Hardin has devoted no time to partnership activities. He was not aware of any partnership meetings. Gary Bergman is a pilot with American Airlines. After talking with Spear about the tax aspects of the Coral transaction, he purchased a 5 1/3 percent interest in RDP. Aside from talking with Spear and a couple of friends, and reading magazine articles, Bergman did nothing to investigate the potential profitability of the Coral research. He does not know many of his partners personally, and he left the partnership *714 affairs to Spear. James McGee manages rental properties as an occupation. He is a four-percent partner in RDP. Aside from talking to Spear and some of his partners and reading magazine articles, McGee did nothing to investigate the potential profitability of the Coral transactions although he did discuss the tax implications of the Coral transactions with Spear. Paul DeGroat was an electrical engineer with Xerox for 23 years until his retirement in 1987. After consulting with Don Spear, he purchased a four-percent interest in RDP. DeGroat has met only a few of his partners. He did not know if he was liable on a cruzeiro note or how much money he thought RDP would make. He left any decision about the direction for medical research to Spear. He did not know when the Research Note to Coral was due. Edward Bach is a photo retoucher. He purchased a 6 2/3 percent interest in RDP after hearing Spear on the radio. Bach does not know any of his partners. He had no idea what RDP's financial projections were. He did not have enough resources to pay any demand on his $ 40,000 note to the partnership. When he applied for a mortgage in 1983, he did not list his $ 40,000 note to the *715 partnership as a liability. Ruth Sutton heard of RDP from Steve Wisdom, who is Don Spear's nephew and employee. She acquired a four-percent partnership interest by investing $ 3,400 cash and signing a note for $ 25,000. Sutton testified that Wisdom told her she would probably not have to pay off her note because it was denominated in cruzeiros and could be expected to devalue to insignificance by its due date in 7 or 8 years. Sutton's main purpose for entering into the partnership was to save money on taxes. Spear told Sutton that "paying your income tax is optional * * * tell me what you would like to pay in income tax, and I will provide you with the deductions to get you down to where you will pay that much." Robert Winn is a pilot for American Airlines who heard about Coral from Spear. Winn invested $ 3,269 cash and a $ 25,500 note and acquired a four-percent interest in RDP. He had faith that Spear would not ask him to pay off the note because of "stipulations of the way the business was set up." Winn did not know 16 of his 18 partners. He did not know if the partnership signed a cruzeiro note. He thought there was a transfer of money to a foreign currency, but he was *716 not sure how that was done. He did not know how the partnership paid for the research. Winn has never attended a partnership meeting. He assumed the partnership received a formula from Coral but he does not know the whereabouts of that formula. He has never requested any information about the value of Coral's services. Other than talking with Spear, he has never investigated the possibility of commercial exploitation of the research. Winn talked with Spear about the tax aspects of the Coral investment. Tax relief was the reason he entered into the investment. Thomas Hennessey is a pilot for Northwest Airlines. He became a 9 1/3 percent partner in RDP on the advice of Spear. Spear gave Hennessey a printed form indicating the exchange rate history of the cruzeiro from 1970 to June of 1982. Spear also gave Hennessey a chart indicating what the partnership would mean to him personally. The chart assumes the cruzeiro will devalue 60 percent per year and indicates an investor in the 50 percent tax bracket would receive tax benefits totaling $ 14,752 for a $ 5,000 cash investment. Hennessey could not have paid off a $ 500,000 note either in 1982 or at the time of trial. Marc *717 Geller was the only partner from Alfa to testify at trial. Geller's occupation for the last 15 years has been investing. He has both a law degree and a masters in taxation. He thought it was a potentially viable investment, and the tax benefits attracted him. Geller knew that the Research Note Alfa gave Coral was denominated in cruzeiros, that the cruzeiro had been an extremely volatile currency, and that there was a reasonable likelihood that the cruzeiro would devalue over time which would reduce the payment from Alfa to Coral. Aside from obtaining the one-sentence letter from Dr. Carlton recommending that the partnership select Pseudomonas aeruginosa 6 for its research project, neither Geller nor Alfa consulted with anyone else about the project or its profit potential. Geller did not know who negotiated the research and development agreement on behalf of the partnership. Geller purchased a 16.53 percent interest in Alfa. Geller's $ 14,666.66 cash investment in Coral reduced his 1982 adjusted gross income by $ 96,530 and reduced his tax liability by $ 22,256. OPINION The first issue we address is whether the notes denominated in Brazilian cruzeiros given to Coral by Agro, *718 RDP, and Alfa in connection with Coral's undertaking the development of specific monoclonal antibody conjugates were valid indebtedness. Much of the deductions claimed by the Partnerships pursuant to section 174 resulted from claiming liability on the notes denominated in Brazilian cruzeiros. Section 174 allows, at the taxpayer's election, a current deduction for research and experimental expenditures incurred during a taxable year in connection with the taxpayer's trade or business. The Research Notes represented seven-eighths of the amount each Partnership claimed as research and experimental expenditures. Section 163 allows a deduction for all interest paid or accrued within the taxable year on indebtedness. If indebtedness has no reality or substance apart from anticipated tax benefits, it will be disregarded. Knetsch v. United States, 364 U.S. 361 (1960). Neither the deduction for expenses supported by false debt nor putative interest on it is allowable. Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965); Levin v. Commissioner, 832 F.2d 403 (7th Cir. 1987), affg. 87 T.C. 698 (1986). *719 We are convinced that the notes signed on behalf of Agro, RDP, and Alfa were not compelled by business realities but rather were incurred solely for expected tax benefits. The notes furnished the leverage needed to create large write-offs to produce tax benefits larger than any current or future cash requirements of the Partnerships. Most importantly, the terms of the indebtedness contravened standard commercial practice. Levin v. Commissioner, supra.
The terms of the notes bore no relationship to business practice in Brazil. Unlike standard commercial practice, the notes provided no indexation or monetary correction clauses to protect against devaluation of the principal of the debt. Prior to 1982, Brazilian currency had undergone hyperinflation and devaluation against the dollar. "Petitioner's protest, -- 'How could we know that inflation would continue,' -- rings hollow." Levin v. Commissioner, 87 T.C. at 407. In 1982 the annual inflation rate in Brazil reached 99.7 percent and many economic forecasters, including respondent's expert, predicted at that time that the inflation rate would decline only modestly in later years. Reflecting this widely *720 held view, the standard practice in financial transactions in Brazil in 1982 was to incorporate monetary correction or indexation clauses into contracts. Further, the interest rate on the Research Notes was far below market at an annual 10 percent rate, which was a rate that many commercial lenders were charging per month in 1982. High monthly rates of interest were paid on bank deposits, bank certificates of deposits, and automobile loans. The promoters of the Coral projects and many of the investors were aware of the adverse inflationary pressures on the Brazilian cruzeiro. Investors were given historical information on the declining value of the Cruzeiro as part of the promotion of the projects. We believe no one expected to pay any significant part of the "liability" represented by the Research Notes. Indeed, each Partnership's Research Note could have been satisfied in January 1988 by a payment of $ 184. By contrast, the Partnerships each claimed their Research Note supported $ 525,000 of research and development expenses and sizable interest deductions. Moreover, the Research Notes were unnecessary to the economics of the research undertaking. The $ 75,000 cash payments *721 made by the Partnerships to Coral were more than sufficient to cover the value of the services performed by Coral for the benefit of the Partnerships. The notes were each approximately equivalent to $ 525,000 in United States currency on the date of execution. Dr. Kennett, the court appointed expert, testified at trial that the task of making antibodies that would react to the specific antigens chosen by the Partnerships, i.e., Escherichia coli K99, Shigella boydii K7 and Pseudomonas aeruginosa 6, was, to a knowledgeable scientist, a manageable undertaking. He found the amount of money charged by Coral to make the monoclonal antibody conjugates exorbitant. He stated, "I could certainly produce all of those antibodies in those three contracts for $ 200,000, and the work would probably be done in six months, and I would probably have half of that money left to do something else." The Research Notes were superfluous to the transactions, aside from the attempt to secure tax benefits. Because the Research Notes did not comport with business reality, we hold that they should be ignored (as we believe all the investors intended). Consequently, petitioners are not entitled to any distributive *722 share of research and development expense or interest accruing on or in connection with the Research Notes or of any other Federal income tax benefit determined by reference to these Notes. Next we consider whether petitioners are entitled to any deduction for research and experimental expenditures pursuant to section 174 in connection with the development of monoclonal antibody conjugates by Coral on behalf of the Partnerships. Section 174(a)(1) provides that research or experimental expenditures paid or incurred during the taxable year in connection with a taxpayer's trade or business may at the taxpayer's election be deducted currently rather than capitalized. The term "research or experimental expenditures" is defined in the regulations as expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. * * * [Sec. 1.174-2(a)(1), *723 Income Tax Regs.] We have found this definition to be "consistent with the intent of the statute to limit deductions to those expenditures of an investigative nature expended in developing the concept of a model or product." (Emphasis omitted.) Mayrath v. Commissioner, 41 T.C. 582, 590 (1964), affd. 357 F.2d 209 (5th Cir. 1966). Section 174 requires that the taxpayer's expenditure is for research or for experimental purposes. Scientific research and development costs for purposes of section 174 includes an attempt to discover or develop a product, or to develop a new technique or procedure. The goal of the research must be scientifically reasonable, but research is more than repeating what has already been done. It requires some element of experimentation. Petitioner presented one expert witness at trial to testify about the scientific aspects of the transactions, Henry D. Isenberg, Ph.D. Dr. Isenberg has a Ph.D. degree in Microbiology. He is a microbiologist and the Chief of the Division of Microbiology at Long Island Jewish Medical Center. He is also a clinical professor in Medical Microbiology and Immunology at the University *724 of South Florida College of Medicine. Dr. Isenberg is a member and officer of many professional societies and has received many honors in microbiology. He has been the editor of a variety of medical journals and has published numerous articles on topics related to microbiology and health. His field of concentration is epidemiology. Respondent presented two expert witnesses at trial with regard to the scientific aspects of the transactions, Michael V. Norgard, Ph.D., and Milton R. Tam, Ph.D. Dr. Norgard has a Ph.D. degree in Microbiology and is an Associate Professor of Microbiology at the University of Texas, Southwestern Medical Center at Dallas. He runs a microbiology research program and teaches microbiology and infectious diseases. Dr. Norgard is a member of scientific societies related to microbiology and disease, has lectured on microbiology, and has received many honors in his area of expertise. Dr. Norgard has published numerous articles on microbiology, including several articles on E. coli. Dr. Tam has a Ph.D. degree in Immunology. He is a Program Manager for Bacteriology and a Senior Scientist with Genetic Systems Corp. He has published many articles on immunology *725 and monoclonal antibodies. At Genetic Systems Corp., he manages, directs, and supervises programs associated with the development of monoclonal antibodies, and their use for immunological assays and diagnostic tests. Roger H. Kennett, Ph.D., was a neutral, court-appointed expert witness. Dr. Kennett has a Ph.D. degree in Biochemical Sciences from Princeton University and is an Associate Professor of Human Genetics at the University of Pennsylvania School of Medicine. Dr. Kennett has published extensively, including three books and many articles about monoclonal antibodies. All of the experts were very well-qualified in their respective specialties. Petitioner's expert, Dr. Isenberg, testified to the importance of the monoclonal antibody production in epidemiology, the transfer of disease. Dr. Isenberg is a leading authority on the subject of epidemiology. He does not, however, have the expertise to comment on the particular scientific processes at issue in this case. We, therefore, do not give much weight to Dr. Isenberg's testimony on monoclonal antibodies. We relied heavily on the opinions of Drs. Kennett, Norgard, and Tam to analyze the scientific aspects of the monoclonal *726 antibody conjugate production. We hold that Coral's development of monoclonal antibody conjugates on behalf of Agro, RDP, and Alfa does not qualify as "research or experimental expenditures" as defined in section 1.174-2(a)(1), Income Tax Regs. Producing the monoclonal antibody conjugates was clearly scientific work. The projects required a laboratory and trained scientists and technicians. The Coral laboratory in Cambridge was adequate, and the Coral staff in Cambridge was qualified for producing the monoclonal antibody conjugates. The services Coral performed, however, were not investigative in nature. Rather, as Dr. Kennett's testimony reveals, the projects undertaken by Coral were routine. Our discussion at trial was as follows: THE COURT: If somebody had come to you in 1982 and said, I would like you to produce for me what is asked for in the research contracts here for Shigella, Pseudomonas and E. coli * * * what would you have said about the likelihood of being able to produce the monoclonal antibody? * * * THE WITNESS: There are few sure things in research, but this is so sure that I could say that we can do it. I can almost assure them that we would be *727 able to do it within a year. And we will probably get it done much sooner than that. The contracts here in question did not require Coral to invent or to develop the concept or design of any product. These contracts rather were merely production contracts under which Coral agreed to manufacture or produce certain monoclonal antibody conjugates. Mayrath v. Commissioner, supra.Dr. Kennett and Dr. Tam believed that the monoclonal antibodies sold as projects to investors were those that were easy to produce, rather than those that could be useful for any of the Partnerships' hoped-for purposes, such as diagnostics. The primary stated purpose for producing the monoclonal antibody conjugates was for diagnostics. A panel of the monoclonals was proposed for use in a kit to test for the presence of a particular organism in urine, blood, or stool samples. A simple color change would indicate that the organism was present. Campbell testified that a large number of monoclonal antibodies was needed for this purpose. Dr. Kennett and Dr. Tam testified, however, that the Coral antigens were not obviously useful for diagnostics. Even if the monoclonal antibodies *728 selected were appropriate, Dr. Tam testified that the ability to test for a specific antigen of the organism does not help the physician prescribe treatment for a patient because the serotype (the antigen pattern of the organism) does not determine the antibiotic susceptibility of a particular bacterium. The physician needs to know only that the organism is, for example, E. coli. When the physician suspects an E. coli infection, he will prescribe initially an antibiotic that he believes to be active against a broad group of organisms, depending on the patient's condition and using his best guess. He will then determine the actual antibiotic susceptibility of that organism by isolating it, growing it on media, and testing it with individual antibiotics to determine to which antibiotic it is sensitive. Based on the results of this testing, which takes 24 to 48 hours, the physician will alter the initial antibiotic prescribed if necessary. Another problem with the Coral approach is that to test for the presence of one of the organisms, each antigen of that organism must be tested for. E. coli has more than 160 "O" antigens, more than 50 "H" antigens, and more than 100 "K" antigens. *729 Shigella boydii has 15 antigens and Pseudomonas aeruginosa has 17 antigens. To test for the presence of the organism, all of the monoclonal antibodies against each antigen of the organism would have to be grouped into one kit. Dr. Tam and Dr. Kennett both testified that if more than four or five antibodies are grouped in one solution, the antibodies begin to interfere with each other, affecting the outcome of the test. Of course, each antigen could be tested for separately. In the case of E. coli, however, that would involve 160 different tests just to cover the "O" antigens, which would be both time-consuming and costly. Coral, therefore, was not "researching" to develop a practical commercial test kit. Even if it was feasible to combine the monoclonals for all antigens of each organism, Coral could not have done so because only some of the antigens for each organism had been sold as projects to investors. Because monoclonals are antigen specific, using only a single monoclonal as the Partnership had planned could have been misleading. A negative report would indicate the absence of that particular antigen while the bacterium with other antigens was present. In short, Coral's *730 research and development plans could not under any circumstances have created a useful testing kit for any of the organisms at issue. Dr. Tam believed that a viable approach to using monoclonal antibodies for diagnostics would be to search for a single monoclonal antibody that reacts to all antigens or serotypes of the target pathogen. Coral, however, was only locating monoclonal antibodies against each single antigen of the organism. Coral was not researching to find a monoclonal antibody suitable for diagnostics. Instead, Coral was merely producing monoclonal antibodies against single antigens that were not particularly important. Another weakness in Coral's approach was that its contracts did not specify for what use the monoclonal antibody was being produced. As a result, Coral's production of monoclonals was necessarily incomplete in every project. Coral produced only one of the several subclasses of antibody in a mouse. Some subclasses of the antibodies are more suited to particular types of assays or tests. For example, one subclass would be suitable for a blood test, another for a urine test. Dr. Kennett testified that because Coral did not know what the antibodies *731 would be used for, it should have provided several classes of the antibodies. Coral in fact produced only a single subclass of each monoclonal antibody for each antigen. Coral kept laboratory notebooks for each of the projects at issue. The state of Coral's lab books, however, evidences the lack of serious research in these cases. A scientist keeps a lab book so that another scientist can follow the steps taken and reproduce the work or experiment. In other words, another scientist should be able to follow the trail laid out in the lab book and duplicate the experiment. The lab books in this case were sloppy and casual, both in the way they were assembled and in the way the information was recorded. The lab books were divided into sections and contained forms to fill in with the results of Coral's efforts to produce monoclonal antibodies. Although the forms if filled in would have provided a lot of necessary information, most of the forms were not filled in. Some sections contained only pages of computer printouts with no explanation. From the condition of the lab books, we conclude that Coral's investigations were not organized or well supervised. Coral produced the monoclonal *732 antibodies in a haphazard manner without adequate scientific technique. Coral's substandard effort in keeping the lab books reinforces our view that producing the monoclonal antibody conjugates did not involve "research or experimental expenditures" within the meaning of section 174. The next issue we must address is whether petitioners intended to make a profit on the investment in Agro, RDP, and Alfa. To deduct expenses of an activity pursuant to section 212, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner, 83 T.C. 79, 97-98 (1984). Although a reasonable expectation of profit is not required, the actual and honest objective of making a profit must be bona fide. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published *733 opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosentlatt v. Commissioner, Zemel v. Commissioner734 F.2d 5, 6-7, 9 (3d Cir. 1984). "Profit" in this context means economic profit, independent of tax savings. Drobny v. Commissioner, 86 T.C. 1326, 1341 (1986); Beck v. Commissioner, 85 T.C. 557 (1985). Petitioners bear the burden of proving they possessed the required profit objective. Rule 142(a), Tax Court Rules of Practice and Procedure. The profit objective is determined at the partnership level. Taube v. Commissioner, 88 T.C. 464, 478 (1987); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In making the determination, we give more weight to the objective facts than to the taxpayer's mere statements of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Surloff v. Commissioner, 81 T.C. 210 (1983). Section 1.183-2(b), Income Tax Regs., provides a list of factors to be used in determining the *734 existence of a taxpayer's profit objective. These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. The list is intended to provide objective standards based upon prior case law. No one factor is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). Based upon the record before us, we find that petitioners' activity with Coral was an "activity not engaged in for profit" within the meaning of section 183. The taxpayers in these cases were general partnerships. The intent of the partners, therefore, is relevant to determine the partnerships' intent. The partners *735 who testified at trial held 48 percent of the partnership interests in Agro, 52 percent of the partnership interests in RDP, and 16.53 percent of the partnership interests in Alfa. We considered the testimony of all of the partners who testified. We can assume that the testimony of the partners who were not at trial would not have been any more favorable to petitioners' position. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The testimony reveals a distinct lack of concern by the partners about the financial condition of either the partnership or their partners, a lack of understanding or interest in the partnership's liabilities, management, or business, and a shallow, if any, investigation into the potential profitability of the partnership's project. While each general partner was jointly and severally liable for all of the partnership liabilities, most of the partners did not know the identity of or the financial status of the other partners in their partnership. The partnerships never made any significant profits. The tax write-offs for research and development, on the other hand, were *736 very large. Of course, given the near certain decline in the value of the cruzeiro and the projected cash flow from promised tax benefits, there was little reason to be concerned about liability on the partners' notes because the partnerships' Research Notes to Coral would require de minimis payments, if any. Many of the partners knew the history of the cruzeiro devaluation at the time of their investment. The participation by most of the partners in partnership activities was minimal. Some partners had attended one partnership meeting while others knew nothing about partnership meetings. The majority of the partners did not spend any significant amount of time pursuing partnership activities. The partners left the operation and management of the partnership to one partner, or to a partnership or corporation that was not a partner. Most of the partners did not have any experience with medical research, manufacturing, or marketing. Some of the partners had read magazine articles about monoclonal antibodies, but could not remember what they had read at the time of the trial. Most partners had done nothing further to investigate the possibility of commercial success of the *737 ventures. They did not request any information about the value of the research that Coral was to perform, or about monoclonal antibody research. Each partnership paid $ 75,000 cash and executed a note for a cruzeiro amount equivalent to $ 525,000 on the date of execution, for services that were worth no more than $ 75,000. The partners for the most part were not aware of the rights of their partnership in exploiting the product of the research Coral agreed to perform. The legal rights of the investors in the monoclonal antibody conjugates was unclear. Coral agreed only to produce a specific monoclonal antibody conjugate for each partnership. The agreements do not specify the amount that Coral was obligated to produce or in what form Coral was to deliver the monoclonal antibodies. Coral did not have any obligation to package or market the conjugate after it was produced. Although the stated goal of the Coral projects was to use the monoclonals for diagnostics, Coral did not agree to incorporate the monoclonal antibodies into any form suitable for commercial use. Because Coral agreed to produce for each partnership a monoclonal antibody against only one antigen of an organism, *738 the monoclonals could not have been packaged into a test kit in any event. The partnerships did enter into marketing agreements with TLC. If TLC marketed a product incorporating the monoclonal antibody conjugates, the partnership was entitled to two to four percent of the net sales price of the product. TLC's right to exploit and market the monoclonal antibodies, however, was limited by the problems with the Coral "research" that we have already identified. Even if combining monoclonal antibodies against all antigens of an organism was feasible, the record does not show that TLC either possessed or could have obtained all of the antibodies. Coral was not researching to find a monoclonal antibody that could have been marketed successfully, such as one monoclonal that would react to all antigens of an organism. The monoclonal antibody conjugates produced by Coral that the partnerships licensed to TLC were not marketable. We conclude that Agro, RDP, and Alfa lacked an actual and honest profit objective in the transactions with Coral, and that they entered into the transactions in issue solely for the tax benefits. To the extent any partnership incurred otherwise allowable deductions, *739 those deductions are limited to income realized. Decisions will be entered for the respondent. Footnotes
1. Cases of R&D Partners - 82, Donald D. Spear, Tax Matters Partner, docket No. 22687-86, and Alfa Medical Research Associates, Marc Geller, Tax Matters Partner, docket No. 22755-86, are consolidated herewith.↩
2. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated.↩
3. 1972
1973
1974
1975
1976
1977
1978
1979
1980
1981
1982
Annual
15.7
15.5
34.5
29.4
46.3
38.8
40.8
77.2
110.2
95.2
99.7
Inflation
Rate a
Percent
10.3
0.0
18.9
22.0
35.2
30.4
29.7
92.7
61.7
95.3
95.8
Increase in
Exchange Rate
a. General price index, Getuli Vargas Foundation, December-December.↩
4. Brazil: Inflation and Exchange Rate, 1982-87
1982
1983
1984
1985
1986
1987
Annual Inflation
99.7
211.0
223.8
235.1
b 65.0
c 210.05
Rate a
Exchange Rate
180.0
577.0
1848.0
6200.0
b 13.65
d 46.0
Percent Increase
95.8
220.6
220.3
235.5
b 120.2
c 209.0
in Exchange Rate
Percentage of
100.0
43.8
13.7
4.1
1.8
0.5
Dec.-1982 value
(dollar/cruz.)
a. General Price Index, Getulio Vargas Foundation
b. 1982-85 cruzeiros/$ : 1986-87: cruzados/$ (currency conversion reform: 1,000 Cruzeiros - 1 Cruzado). c. First 7 months d. July Source: International Financial Statistics and Conjuntura Economica, various issues.↩
5. ↩
Value of Cruzeiro Promissory Notes
1989
1990
1991
1992
TOTAL
Year
(7th)
(8th)
(9th
10th)
Cruzeiro payments:
(1,000)
Principal
31,559.
31,559.
31,599.
31,559.
126,236.
Interest
22,091.
25,247.
28,403.
31,559.
107,300.
Total
53,650.
56,806.
59,962.
63,118.
233,626.
Expected Exchange
Rate (cruzeiros
per dollar)
13,960.
24,428.
42,749.
74,816.
n/a
Dollar payments
3,840.
2,330.
1,400.
840.
8,410.