UNIVERSAL RESEARCH AND DEVELOPMENT PARTNERSHIP NO. 1, RUSSELL O. AYO, JR., HOFMAN MUSIC, INC. AND PAUL E. PALMER, PARTNERS OTHER THAN THE TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Universal Research & Dev. Partnership No. 1 v. Commissioner
Docket Nos. 9893-88, 9894-88, 1729-89, 4329-89
United States Tax Court
T.C. Memo 1991-437; 1991 Tax Ct. Memo LEXIS 486; 62 T.C.M. (CCH) 661; T.C.M. (RIA) 91437; September 5, 1991, Filed *486 Decisions will be entered under Rule 155. J. Tracy Mitchell and Merrick J. Norman, Jr., for the petitioners. Arlene Blume and Kathleen Lier, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION In these consolidated cases respondent determined adjustments to the 1982, 1983, and 1984 partnership returns of Universal Research and Development Partnership No. 1 (hereinafter Universal No. 1), and to the 1983, 1984, and 1985 partnership returns of Universal Research and Development Partnership No. 2 (Universal No. 2). Timely notices of final partnership administrative adjustments (FPAA) were received by Kenneth A. Duncan, tax matters partner for Universal No. 1 and Universal No. 2. [2] Petitioners, partners other than the tax matters partner of Universal No. 1 and Universal No. 2 (sometimes referred to collectively as the partnerships), seek readjustment of partnership items set forth in respondent's notices of FPAA. *487 On November 21, 1989, this Court granted respondent's motions for leave to file First Amendment to Answers in docket Nos. 9893-88 and 9894-88. On February 21, 1990, this Court granted respondent's motions to file a First Amendment to Answer in docket Nos. 1729-89 and 4329-89, and a Second Amendment to Answer in docket Nos. 9893-88 and 9894-88. The deductibility of the following amounts are at issue: Docket
Partnership
No.
Year
Adjustment to partnership income
UNIVERSAL
9893-88
1982
Per FPAA
R&D note
$ 2,625,000
NO. 1
Amendment 1
R&D cash
375,000
Amendment 2
other [3]
30,300  TOTAL 3,030,300
1983
Per FPAA
interest
$  262,500
Amendment 1
--
Amendment 2
other
15,177  TOTAL
277,677
UNIVERSAL
4329-89
1984
Per FPAA
interest
$   262,500
NO. 1
Amendment 1
other
8,942  TOTAL
271,442
UNIVERSAL
9894-88
1983
Per FPAA
R&D note
$   470,000
NO. 2
Amendment 1
R&D cash
30,000
Amendment 2
other
16,160  TOTAL
516,160
UNIVERSAL
1729-89
1984
Per FPAA
interest
$   47,000
NO. 2
Amendment 1
other
3,642  TOTAL
50,642
1985
Per FPAA
interest
$   47,000
Amendment 1
other
5,030  TOTAL
52,030
*488 The issues we must decide are: (1) Whether research and development agreements between the partnerships and Omega Research and Development Corporation (Omega) were entered into with a profit objective; (2) whether the partnerships were engaged in a trade or business within the meaning of section 174; [4] (3) whether promissory notes from the partnerships to Omega were valid indebtedness accruable under the partnerships' method of accounting; and (4) whether Universal No. 1 incurred research and development expenses pursuant to section 174. *489 FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulations of fact and exhibits attached are incorporated herein by this reference. Each of the partnerships had their principal place of business in Baton Rouge, Louisiana, when the petitions in these cases were filed. Each of the petitioners herein also resided in Louisiana at the time of filing their petitions. The partnerships maintained their books and filed their returns on the calendar year basis using the accrual method of accounting. Universal No. 1 and Universal No. 2 were formed effective December 1, 1982, and December 15, 1983, respectively, to "engage in research, experimentation, and development work" and to "manufacture, sell, distribute, put into use, lease, license, and exploit such technology resulting therefrom." Kenneth A. Duncan (Duncan), a business and tax attorney, was the partnerships' initial partner and managing agent. In the spring of 1982, Duncan met Richard McDonald (McDonald) while soliciting advice concerning what turned out to be unsuccessful commodities futures trading activities. McDonald was a nonworking certified public accountant who, like Duncan, had held a wide *490 variety of investments in various enterprises. During the course of their contact, McDonald told Duncan about a research and development (R&D) company he was forming called Omega. In August 1982, McDonald incorporated Omega "to raise funds for research and development in various fields of development" using a "foreign currency incentive technique." Omega developed a list of R&D projects that it had determined were feasible. Omega then offered for sale investment interests in each of these projects at a set fee and + offered to assist in forming Texas partnerships through which to make the investments. The development fee was payable one-eighth in cash and seven-eighths in a promissory note payable in U.S. dollars or Brazilian cruzeiros, at the option of the debtor, 7 to 10 years after the date on which the note was executed. [5]
*491 Universal No. 1
McDonald and Duncan agreed in late September 1982 that Duncan was to form a Louisiana general partnership, rather than a Texas partnership, to invest in and acquire technology from Omega. From October through December 1982 they negotiated the terms of an R&D agreement and a technology transfer agreement between Omega and what became Universal No. 1. On McDonald's advice, Duncan selected a pattern recognition project, designated Project A-40 (A-40), to automatically identify and monitor ingress and egress from large parking facilities. Omega set a research fee of $ 3,000,000 for A-40, with $ 375,000 of that amount payable in cash and the balance in the form of a promissory note. The promissory note accrued simple interest at the rate of 10 percent annually. It was payable in 4 equal consecutive annual installments of principal, plus accrued interest on the portion of the principal installment made, beginning 7 years from the date made. In addition to U.S. dollars, the note gave Universal No. 1 the option of paying off the note with its choice of Brazilian cruzeiros, Argentine pesos, Peruvian soles, Mexican pesos, or Israeli shekels, calculated at the foreign *492 currency exchange rate for the given amount of dollars as of the date when the note was executed. Duncan negotiated for payment in the "basket of currencies" because he wanted additional assurance that at least one of the currencies would devalue against the dollar. The promissory note was recourse and was secured by any amounts earned by Universal No. 1 from the exploitation of the project technology. In the event that A-40 was a commercial success, the parties agreed that mandatory prepayments on the promissory note, payable from passive or active income, [6] would be triggered. However, any prepayments could be made only in either U.S. dollars or Brazilian cruzeiros. All the results of the project, limited to use in parking lots, were "the sole and exclusive property" of Universal No. 1. Omega was granted an option to obtain an exclusive 13-month review license and a right of first refusal in a permanent license. Omega had wanted an option to acquire the permanent license, but Duncan negotiated for the right of first refusal. *493 At the same time he was negotiating the agreements with McDonald, Duncan promoted Universal No. 1. In general, prospective partners were provided with several documents, including a descriptive memorandum, tax opinion, project description, and a disclosure and background of the R&D contractor. The descriptive memorandum described the proposed partnership activity, the risks associated with an investment in the partnership, and the proposed foreign currency arrangement. The project description anticipated a potential market for 5,340 systems which, at a proposed sales price of $ 30,000 per system, would generate a $ 160.2 million market and a $ 48 million potential profit over the first 3 to 5 years of exploitation. These figures were determined by Omega. Thirty one persons became general partners in Universal No. 1 with capital contributions totaling $ 520,000 cash and $ 2,550,000 in promissory notes. Of the stated amount of each partner's capital contribution, approximately 15 percent was paid in cash and the remaining 85 percent was represented by a promissory note. The partners' notes to Universal No. 1 essentially tracked the provisions of the partnership note to Omega. *494 The partnership agreement provided that income and loss allocations would be pro rata based upon each partner's partnership interest. Duncan, as the initial partner, was given an allocated 10 percent partnership interest in exchange for services contributed. [7] He was also appointed management agent at a fee of at least $ 1,000 per year plus expenses. Additionally, under a legal retainer agreement, Universal No. 1 paid Duncan 2.5 percent of the aggregate capital contributions to the partnership for legal services provided to the partnership during its first taxable year. Finally, Universal No. 1 recognized that Omega would pay Duncan a fee for negotiating the R&D agreement. Project A-40
Of the $ 375,000 cash paid to Omega by Universal No. 1, $ 75,000 of this amount was paid to Duncan *495 for setting up the contract between them. On December 31, 1982, Omega entered into an R&D subcontract with Alpha Research and Development Corporation (Alpha). Alpha agreed to provide R&D services with respect to A-40 in exchange for $ 225,000 cash and four additional payments, delineated in Brazilian cruzeiros, to be made between December 30, 1989, and December 30, 1992. Alpha then entered into an R&D subcontract with R. A. McDonald, Inc. (RAMCO). RAMCO agreed to provide R&D services to Alpha with respect to A-40 in exchange for two cash payments totaling $ 202,500, as well as additional compensation, payable as royalties if the project were successfully marketed, in Alpha's choice of currency not to exceed 140,000,000 Brazilian cruzeiros or U.S. $ 700,000. Omega agreed to use its reasonable best efforts to complete A-40 within 1 year, and that its obligations were to expire 1 year from the date of the agreement. The R&D agreement required Omega to keep a record of progress and costs, and to limit its expenditures to those deductible under section 174. Otherwise, Omega had complete discretion over the conduct of its R&D activities. Omega projected A-40 could be developed for *496 approximately $ 355,000, but with risks this figure could exceed $ 800,000. RAMCO did not keep separate records of actual project costs for each of the projects on which it was working. Beginning in January 1983, implementation of A-40 and four or five other projects was begun under the supervision of Daniel L. Dunn (Dunn) at RAMCO's facilities in Chatsworth, California. Dunn was an engineering consultant whose wholly owned consulting firm was being paid $ 6,000 per month by Alpha for his services. Dunn had a wide range of experience in systems engineering and pattern recognition. It was Dunn who had developed the A-40 idea, investigated its feasibility, and researched its market potential by contacting an airport parking lot consultant. Through April 1983, little progress was made on A-40 other than locating and purchasing equipment and finding engineers qualified to work on Omega's projects. Several of the engineers throughout the years at issue worked on more than one of Omega's projects, splitting their time between them. In addition to their salaries, these engineers had a "Compensation/Income Agreement" stating that they would be paid additional amounts designated in *497 Brazilian cruzeiros in the event that certain projects, including A-40, were successful. Dunn envisioned A-40 as a computer system which, upon a vehicle entering a parking lot, would record a visual image of the license plate, then "read" the numbers into a digital format from the image so that the numbers, rather than a picture of them could be stored in the computer memory. Then when the vehicle left the parking lot, the system would again photograph the license plate, "read" the license plate number, and match it to the computer records corresponding to when the vehicle entered the lot. To be feasible, the system needed to "search, find, and read" the number in less than 5 seconds. A digital picture of the rear end of an automobile amounts to a quarter of a million pieces of information, with approximately 1,000 bits of this information relating to the license plate. Because computer memory was limited, RAMCO wanted to isolate the information it wanted, and discard the rest. Between June and July 1983, personnel working on A-40 met with a vision imaging specialist from the University of Southern California (USC), who suggested that RAMCO record the visual image of the license *498 plate using a computer program to generate a line drawing from a digital scan of a photograph, and then use character recognition software to extract from the line drawing an actual digital number. The vision imaging specialist then produced in 17 minutes a line drawing from a photograph of a license plate using USC's sophisticated and expensive equipment. Through July and August 1983, RAMCO tried, without success, to develop software to find the center of a license plate, locate the numbers, and identify them. RAMCO's engineers abandoned those efforts when they realized they had reached a "technological dead end." After abandoning its software research, RAMCO developed a hardware-based line drawing technique which produced, in less than 5 seconds, a simplified computer-generated line drawing of the number on a license plate. The line drawing system was not what RAMCO had set out to do inasmuch as it could not produce "a hard digital number that you could put in a computer." Because of this, personnel in the parking lot business would not buy or test the project. For this reason, and because the cost of development was prohibitive, the line drawing system was not marketable. *499 During RAMCO's work on A-40, McDonald and Dunn occasionally sent written status reports to Universal No. 1. By letter dated February 29, 1984, Omega advised Universal No. 1 that the project had been completed. On March 2, 1984, Omega informed Universal No. 1 that it was exercising its option to obtain a review license. By letter dated May 1, 1985, McDonald notified Duncan that Omega would not exercise its option [8] to acquire a permanent license in the A-40 technology. McDonald concluded that "the 'Pattern Recognition Technology,' although unique and possibly patentable was not sophisticated enough to meet our minimum requirement for Universal's parking lot application." *500 Universal No. 2
In 1983, McDonald asked Duncan if he would like to develop another project. Duncan selected a project, designated Project A-63 (A-63), which would research a system for triggering parking lot entry gates by using a magnetometer to sense the presence of an automobile. On November 29, 1983, Duncan informed potential partners (including all the Universal No. 1 partners) that he was preparing to take subscriptions for investments in a new partnership to undertake A-63. He sent potential partners a project description of A-63, as well as several documents relating to A-40, including the same tax opinion letter. The project description projected that 50,000 units could be sold within 3 years at $ 250 per unit for total sales proceeds of $ 15,000,000 and net profits of over $ 4,000,000. The projected figures were provided by Omega. Twelve persons became general partners in Universal No. 2. Because Duncan was unable to obtain enough contributions to finance A-63 at the price set by McDonald, it was arranged that Universal No. 2 would acquire a 15-percent interest in the A-63 technology for a payment of $ 30,000 in cash and a promissory note of $ 470,000, payable *501 in any one of the same five foreign currencies. The owner of the other 85-percent interest in A-63 is not clear from the record. The structure of Universal No. 2 and its contractual arrangements with Omega differed from those of Universal No. 1 as represented by the following changes to the basic partnership and contractual documents: [9] (a) Duncan's fee under the legal retainer was changed to the greater of a lump sum or 2.5 percent of capital contributions; (b) 50 percent, rather than 70 percent, of passive income was to be applied toward prepayment of the promissory note; (c) Omega was given an option to acquire a permanent license in A-63 for $ 2,250 plus designated royalties (with Universal No. 2 having an option to acquire 20 percent of the permanent license if Omega exercised its option), rather than a right of first refusal; and (d) any prepayments of the promissory notes were to be made only in U.S. dollars, not Brazilian cruzeiros. *502 Project A-63
Dunn proposed the idea for A-63. Omega subcontracted with Alpha for the actual services to be performed on A-63, which in turn subcontracted with RAMCO to perform them. Most of the services were performed by a former employee of RAMCO whom Alpha hired as an independent contractor. Universal No. 2's partners were sent periodic status reports on the work performed on A-63. On May 6, 1985, Omega advised Universal No. 2 that A-63 was successfully completed. On July 15, 1985, Omega exercised its option to acquire a 13-month review license for A-63. No permanent license for A-63 was obtained. Omega did not have the money to market A-63. Partnerships' Activities
The partnerships' agreements with Omega were their only activities. The partners in both partnerships relied upon Duncan, as the initial partner and managing agent, to investigate the projects, maintain regular contact with Omega, and monitor Omega's activities undertaken on the partnerships' behalf. The partners based their decisions to invest on the materials Duncan provided them, the personal reputations of, and information acquired from other partners, their personal belief that the projects *503 had a profit potential, and the tax opinion letter. In addition, Dunn met with several partners in the fall of 1982 and outlined the A-40 program. Duncan relied on McDonald and Dunn with regard to the projects' feasibility and market potential. When investigating the reputations of McDonald and Dunn, Duncan relied on the references they provided. Upon learning from Omega that A-40 was not marketable, Duncan met with an airport parking lot consultant to confirm this information. Both partnerships' place of business was in Duncan's law office. Duncan corresponded with the partners of both partnerships by mail several times and by phone numerous times throughout the years at issue. Duncan met with McDonald once in California in 1982, and visited Omega's facilities twice in 1983. On May 6, 1987, Universal No. 1's partners decided not to invest additional money because the economy was poor and some partners did not have additional capital to invest. At the end of each of the years at issue the dollar values of the foreign currencies designated in Universal No. 1's promissory note to Omega were as follows: U.S. DOLLARS REQUIRED TO FOREIGN CURRENCY OBLIGATION
PURCHASE FOREIGN CURRENCY
1982
1983
1984
167,418,562,500 Argentinean Peso
$ 2,625,000
$   620,069
$   93,530 1,061,812,500 Brazilian Cruzeiro
2,625,000
874,431
333,903  81,375,000 Israeli Shekel
2,625,000
834,264
277,540  332,062,500 Mexican Peso
2,625,000
2,000,377
1,581,250 2,218,125,000 Peruvian Sol
2,625,000
1,081,838
639,229
*504 In their first taxable year, both partnerships elected to treat as research and development expenses under section 174 the amounts paid to Omega in cash and the face values of the promissory notes. They also passed through to their partners a deduction for part of their organization fees. [10] In their next 2 taxable years, both partnerships passed through deductions for organization fees, administrative expenses, and for interest accrued on the promissory notes. In his notices of FPAA, respondent determined that no deductions were available for the promissory notes or for the interest accrued thereon. In his amendments to answers, respondent alleged that none of the partnerships' expenses were deductible. On December 31, 1989, the first one-quarter installment, plus accrued interest, was due to Omega on the promissory note from Universal No. 1. Universal No. 1 paid Omega that installment in Brazilian new cruzados, *505 [11] which in 1989 was the equivalent of $ 31, and reported $ 1,115,594 gain on its 1989 return. OPINION 1. The Profit Objective -- Section 183. The first issue that we decide is whether the R&D agreements between the partnerships and Omega were entered into with a profit objective. Except as provided in section 183, no deductions are allowable for expenses incurred in connection with an activity which is not engaged in for profit. Sec. 1.183-2(a), Income Tax Regs. Whether the partnerships' activities were engaged in for profit is to be determined at the partnership level. Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Since both partnerships were formed as general partnerships, the intentions of all the partners are relevant. Agro Science Co. v. Commissioner, T.C. Memo 1989-687, *506 affd. 934 F.2d 573 (5th Cir. 1991). The facts and circumstances must show that the partnerships had "an actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, the partnerships' objective of making a profit must have been bona fide. Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). Profit in this context means economic profit, independent of tax savings. Beck v. Commissioner, 85 T.C. 557, 570 (1985). Respondent bears the burden of proving that the partnerships lacked the requisite *507 profit objective since he raised the issue for the first time in his amendments to answers. Rule 142(a). Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. No single factor, nor even the existence of a majority of the factors, is controlling. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Rather, the issue is one of fact to be resolved on the basis of all the facts and circumstances. Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). Initially, we address respondent's claim that in order for the partnerships to prevail, they must have had the "primary" objective of making a profit. Respondent's contention is not the law of this Court in this context of section 183; we focus "on the economic viability of the transaction[s] and on the actual and honest nature of the [partnerships'] profit objectives." Levy v. Commissioner, 91 T.C. 838, 871-872 (1988). However, the Fifth Circuit recently found that similarly situated taxpayers lacked a *508 profit objective when they had "the primary intent of realizing tax advantages." Agro Science Co. v. Commissioner, 934 F.2d at 576. Since this standard apparently conflicts with our own, but the instant case would be appealable to the Fifth Circuit, we apply the doctrine of Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and follow the rule as adopted by the Fifth Circuit. Consequently, respondent must prove that the partnerships did not enter into the agreements primarily in furtherance of a bona fide profit objective independent of tax objectives. In general, respondent bases his argument on a postulate (whether expressed or implied) that Duncan and McDonald were phony tax shelter promoters and that the other partners' reliance on them was inconsistent with a profit objective. There can be some room for doubt that Duncan was acting completely in good faith in his investigations, monitoring, and follow-up on the projects, as well as in his dealings with Omega. As the promoter, he was obviously willing to accept any profit created, but he would receive his fees in any event. However, we *509 do not base our decision solely on the actions of Duncan. Additionally, although Duncan's services to the partnerships may have been less than thorough, we are not persuaded that they were deficient to the extent that the other partners were not justified in relying on him as their representative. Four other partners testified at the trial on this matter. All four were partners in Universal No. 1, and one of them was also a partner in Universal No. 2. Their testimony was credible and consistent. Each studied the promotional material provided by Duncan on the partnerships and the projects, and based his determination to invest on his view that there were opportunities for profit. They believed the "foreign currency factor" gave them a measure of protection in their investment. Once the partnerships were formed, they relied on Duncan to monitor and follow-up on the projects and to keep them informed. The perceived opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. Both partnerships projected substantial profits if the projects were successfully marketed. *510 Petitioners presented expert testimony that if A-40 had been developed as originally envisioned, it would have saved airports millions of dollars, and profits would have been comparable to Universal No. 1's projections. The expert also stated that A-63's market potential would not have been as high as A-40's because it did not involve revenue control, but if the two systems had been marketed together, Universal No. 2's profits could have been comparable to those projected. If the projects had been successfully developed, we are not persuaded that a sales price of $ 3,000,000 for A-40 and $ 500,000 for 15 percent of A-63 would have been unreasonable. Respondent argues that relying on information provided solely by persons involved in the transactions, and not conducting any independent investigation, shows that the partnerships lacked a profit objective. In support, respondent presented expert evidence that Omega did not follow industry standard operating procedures while investigating market potential, feasibility of the projects, and in maintaining records on work performed and costs incurred. Apparently, respondent is arguing that the partnerships would have known this had *511 they made independent investigations, i.e., hired outside experts, and their failure to do so shows a lack of profit objective on their part. Based upon the facts and circumstances of this case, we are not persuaded that the partners, including Duncan, were unreasonable in relying on information provided by Omega concerning the projects' feasibility. There is no doubt that Omega attempted to fulfill its contracts, and we believe that at the time of contracting, Omega, through Dunn's investigations, reasonably believed that it could develop successful projects. In fact, the record shows that Omega continued to hold this belief throughout the years at issue since it obtained review licenses for both projects even though it was not contractually obligated to work on either project for more than 1 year. Duncan investigated the personal reputations of Dunn and McDonald, albeit with the references they provided, to determine whether the partnerships wanted to do business with them. While respondent argues that the partnerships should have contacted outside experts to determine whether the projects were feasible, his own expert stated that for A-40 this would have cost, before spending *512 anything on R&D, between $ 30,000 and $ 40,000. We are not persuaded that the course the partnerships followed in investigating the feasibility of the projects was unreasonable. Respondent also argues that Duncan's services to the partnerships were inadequate. Although Duncan's services could have been more thorough, we do not find that they were fatally deficient. While Duncan did not fully negotiate the price of the projects, he did not blindly accept all of Omega's terms. He negotiated for additional foreign currencies, subjected the agreements to Louisiana law, and limited Omega's right in A-40's permanent license to a right of first refusal (later renegotiated). While Duncan was not technically proficient in the projects and did not insure Omega maintained records on work performed and costs incurred, he did keep the partners informed on the status of the projects. Upon learning that A-40 as developed was not marketable, Duncan met with a person from the airport parking industry to confirm this information. In sum, the partners may have been too trusting, but we believe their conduct was reasonable and was not undertaken primarily to obtain tax benefits. [12] We hold that *513 respondent has failed to prove that the partnerships did not have economic profit as their primary objective. See Rule 142(a). Based on this determination, we need not address respondent's alternative argument that these were generic tax shelters. See Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). For all the years at issue, both partnerships treated the deductibility of their organization fees and administrative expenses correctly. *514 In 1982, Universal No. 1 properly passed through to its partners a deduction for a guaranteed payment to partner. Whether the partnerships properly passed through a deduction in their first taxable year for the cash they paid to Omega is discussed in the second and fourth issues infra. 2. Trade or Business--Section 174. The second issue is whether the partnerships were engaged in a trade or business within the meaning of section 174. Section 174(a)(1) provides that a taxpayer may elect to "treat research and experimental expenditures which are paid or incurred by * * * [it] during the taxable year in connection with * * * [its] trade or business as expenses which are not chargeable to capital account." Expenses so treated are deductible in the year paid or incurred. Levin v. Commissioner, 87 T.C. 698, 723 (1986), affd. 832 F.2d 403 (7th Cir. 1987). Since this issue was raised by respondent by amendment to his answer, he bears the burden of proof on it as to both partnerships. Rule 142(a). Respondent argues that any expenses paid or incurred by the partnerships were not "in connection with" a trade or business within the meaning *515 of section 174. By using the term "in connection with," Congress intended to dilute section 174 of section 162's "ordinary and necessary" requirements and thereby not require a taxpayer to be engaged in a trade or business at the time expenditures are incurred. Snow v. Commissioner, 416 U.S. 500, 40 L. Ed. 2d 336, 94 S. Ct. 1876 (1974), revg. 482 F.2d 1029 (6th Cir. 1973), affg. 58 T.C. 585 (1972). Although Snow established that a taxpayer need not be currently engaged in a trade or business, we have stated that: For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. * * * [Green v. Commissioner, 83 T.C. 667, 686-687 (1984); emphasis in the original, fn. ref. omitted.]
This trade or business requirement must also be considered in conjunction with section 1.174-2(a)(2), Income Tax Regs., which states that the provisions of section 174(a)(1) "apply *516 not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by * * * [it] but also to expenditures paid or incurred for research or experimentation undertaken on * * * [its] behalf." Despite the fact that a taxpayer may engage in an activity with a profit objective, no section 174 deduction is available if the taxpayer is in effect no more than a mere investor. Green v. Commissioner, supra at 687. The management of investments, regardless of the amount of time required, is not a trade or business. Higgins v. Commissioner, 312 U.S. 212, 218, 85 L. Ed. 783, 61 S. Ct. 475 (1941); Green v. Commissioner, supra at 688. Under a variety of factual settings, we have made the distinction between taxpayers engaged in a trade or business for purposes of section 174, and taxpayers whose activities and contractual arrangements revealed that they functioned only as "[vehicles] for injecting risk capital into the development and commercialization" of the various products involved. Green v. Commissioner, supra at 687; Diamond v. Commissioner, 92 T.C. 423 (1989), affd. *517 930 F.2d 372 (4th Cir. 1991); Levin v. Commissioner, supra at 407. In the instant matter, both partnerships received status reports and kept up with the progress of the projects. These activities are consistent with investor activities and alone are insufficient as a matter of law to establish a trade or business for purposes of section 174. Zink v. United States, 929 F.2d 1015, 1022 (5th Cir. 1991). Engaging in a trade or business requires something more than merely devoting time and energy to an activity. Cf. Green v. Commissioner, supra at 688-691. The partnerships claim they have met trade or business status because they did not contract away the equivalent of an exclusive right to manufacture and market successful projects. Retaining the right to control manufacturing and marketing of the project is not enough to be engaged in a trade or business; we must also look at the partnerships' intentions at the time of contracting to determine "whether * * * [they] reasonably anticipated availing themselves of the privileges they possessed on paper." Levin v. Commissioner, supra, 832 F.2d at 406. *518 Our "controlling inquiry" is whether there was a "realistic prospect" that the partnerships claiming the deduction would enter into a trade or business with respect to the technology being developed. Zink v. United States, supra 1022-1023. On brief, both parties have treated both partnerships as having essentially the same attributes. We disagree. The partnerships are two distinct entities, were created under different factual circumstances, and have dissimilar contractual and financial arrangements. It is clear that Universal No. 2 had no realistic prospect that it would enter into a trade or business with respect to the A-63 technology. It had no business activities other than its 15-percent interest in A-63, and its interest in a permanent license was subject to divestment by Omega exercising its option to acquire the license for $ 2,250. Even if Universal No. 2 were to exercise its option to acquire a 20-percent interest in any permanent license that Omega obtained, Universal No. 2 could never control manufacturing and marketing of A-63. Therefore, at the time of contracting it was known that, if a money-making business should materialize, there *519 was no reasonable prospect that Omega would permit exploitation by Universal No. 2. Rather, Omega would exploit A-63 itself. Cf. Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. a Memorandum Opinion of this Court. With respect to Universal No. 2, we hold for respondent on this issue. Accordingly, the cash Universal No. 2 paid Omega was not deductible, but instead was part of its capital investment. With respect to Universal No. 1, Omega could not unilaterally divest the partnership of its permanent license. While Universal No. 1's legal rights must be backed by a probability that it would go into business, Levin v. Commissioner, supra, 832 F.2d at 407, the burden of proof on this issue is borne by respondent. Rule 142(a). Respondent argues that it was more likely that Omega rather than Universal No. 1 would market A-40 because Universal No. 1 lacked additional capital, experience, and facilities. We disagree. At the time of contracting, Omega had essentially the same inadequacies, other than contacts and technical experience, that Universal No. 1 did. Additionally, in negotiating the technology transfer agreement, *520 Duncan specifically refused to grant Omega an option in a permanent license for A-40 but instead granted it a right of first refusal. It also appears, at least in the short run, that it would have been economically more beneficial for Universal No. 1 to manufacture and market the A-40 technology since prepayments on the promissory note would then have come from 50 percent of active income rather than 70 percent of passive income. Respondent has failed to prove that there was no realistic prospect that Universal No. 1 would manufacture and market A-40. We find that Universal No. 1 was engaged in a trade or business for purposes of section 174 and therefore hold for Universal No. 1 on this issue. We leave for the fourth issue the question of whether Universal No. 1 incurred expenses deductible under section 174. 3. The Promissory Notes--Valid Indebtedness? The next issue that we decide is whether the promissory notes from the partnerships to Omega were valid indebtedness accruable under the partnerships' method of accounting. Since we have already held that Universal No. 2 was not engaged in a trade or business, but was only an investor, supra Issue 2, it follows that *521 its promissory note was not deductible in any event, but was simply part of its capital investment. Nevertheless, Universal No. 2's promissory note is still at issue since section 163 allows a deduction for all interest paid or accrued within the taxable year on indebtedness. The burden of proving that the notes, and the interest thereon, were deductible rests with petitioners. Rule 142(a). A transaction will be accorded tax recognition only if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-584, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978). Whether a transaction lacks economic substance or business purpose is a question of fact. Levy v. Commissioner, 91 T.C. 838, 854 (1988). The proper tax accounting treatment of a genuine debt is distinct from the question of whether the obligation itself is a genuine debt. Levin v. Commissioner, supra, 87 T.C. at 729. An indebtedness with no reality or substance apart from anticipated *522 tax savings is disregarded for tax purposes. Knetsch v. United States, 364 U.S. 361, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960). Expenses attributed to such invalid indebtedness, and the putative interest thereon, are therefore not deductible. Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965). In Agro Science Co. v. Commissioner, supra, we addressed the validity of notes similar to those present in the instant matter, payable in the maker's choice in Brazilian cruzeiros or U.S. dollars, and held that they were incurred solely for tax benefits. We found that the notes were not compelled by business realities because their terms contravened standard Brazilian commercial practices, which would have provided indexation or monetary correction clauses to protect against devaluation of the principal of the debt. Petitioners argue that Agro Science Co. is distinguishable from the instant matter because the partnerships here never operated, nor intended to operate, in a foreign country where they would be subject to its standard commercial practices. Rather, they argue that the partnerships had a business purpose in addition *523 to a tax purpose for allowing the devaluation of the dollar value of the debt. Omega promoted funding its projects using the "foreign currency incentive technique" as a way to solve the "inventor's dilemma." The inventor's dilemma involves a potential conflict between an inventor who feels that he has a valuable idea but is wary of entrepreneurs who take advantage of him, and a venture capitalist who does not want to pay a substantial amount for a project until it is a proven success. Petitioners argue that the capital structure in these cases (part cash, part promissory notes) was set up to bring these people together; the entrepreneur would make a cash payment up front that would provide the hard dollars necessary to pay for basic materials and hire technicians to do research, and the promissory notes provided the mechanism to compensate the inventor for a successful project. If successful, prepayments on the notes would be required. If not, payment would come in any event in 7 years. Petitioners argue that this provided an incentive to the inventor to quickly develop a successful project: the longer development took, the fewer actual dollars he faced receiving because of the *524 potential devaluation of the foreign currencies in the notes. On the entrepreneur side, petitioners argue that the capital structure shifted some of the risk for an unsuccessful project to the inventor, making the entrepreneur more receptive to investing as well as providing him a tax benefit with an upfront deduction. In their briefs, both parties cite Levin v. Commissioner, supra, but neither party notes that the taxpayer in Levin claimed the same business purpose as that claimed by petitioners in the instant matter. In Levin, we rejected the taxpayer's argument because the "inventor" already had an incentive to develop quickly, without the use of devaluating promissory notes, since its receipts under a marketing agreement would rise as sales rose. 87 T.C. at 731. As noted in the second issue, the partnerships are two distinct taxpayers, and we treat them differently here. With regard to Universal No. 2, we find that Levin is controlling. Universal No. 2 only held a 15-percent interest in the A-63 technology. Although the record is not clear, it appears that the remaining 85 percent was held by either Omega, Alpha, or RAMCO, and that Omega *525 did have an incentive to quickly develop A-63 irrespective of the use of the promissory note. Universal No. 2 has failed to persuade us that it had a business purpose for using the note, and that it did not use the note solely for the tax benefits that would inure therefrom. Cf. Agro Science Co. v. Commissioner, supra; Levin v. Commissioner, supra. We hold that Universal No. 2's promissory note was invalid debt. See supra Issue 2. With respect to Universal No. 1, the facts are different. Universal No. 1 owned 100 percent of the technology in A-40 (limited to use in parking lots) and with it the right to all profits from exploitation after satisfying the promissory note. While Omega held and investigated the right to use A-40 technology in other endeavors, the record does not support a finding that Omega had motivations to develop the technology beyond the fulfillment of its contract with Universal No. 1. On the contrary, we believe that the note provided Omega the incentive for the work it performed. That Omega valued the note as an incentive to develop A-40 is shown by the fact that Omega believed that the project was feasible and that prepayments for *526 a successful project could be made in Brazilian cruzeiros. It was only after the foreign currencies devaluated more quickly than anticipated that Omega and Universal No. 1 agreed that prepayments for a successful project could be made only in dollars. In negotiating this amendment, Omega claimed that it no longer had the incentive to work on the project beyond the first year of the contract because of the unexpected rapid devaluations of the currencies. Universal No. 1 then granted Omega's request so as to provide it an additional incentive to acquire the review license. We also note that incentive contracts, albeit not of the sort used by Universal No. 1, are not uncommon. Respondent states that the established method to encourage inventors to perform is to denominate the note in dollars and stipulate a specific penalty for delaying completion. However, as long as Universal No. 1's note is imbued with tax-independent considerations, it is generally free to structure its transactions as it pleases. See Gregory v. Helvering, 293 U.S. 465, 79 L. Ed. 596, 55 S. Ct. 266 (1935). Respondent determined that the note was a contingent amount in excess of the fair market value of the work performed *527 and that interest on the note was contingent on the project's successful generation of royalties. Even if recourse, an obligation will not be treated as a true debt where payment, according to its terms, is too contingent. Waddell v. Commissioner, 86 T.C. 848, 901 (1986), affd. 841 F.2d 264 (9th Cir. 1988). On the other hand, as this Court said in Burnham Corp. v. Commissioner, 90 T.C. 953, 955 (1988), affd. 878 F.2d 86 (2d Cir. 1989): A taxpayer may compute taxable income under an accrual method of accounting, and thus, may deduct an expense in the year in which it is incurred regardless of when it is actually paid. Sec. 446(e)(2). The all events test is the standard for determining the year in which an expense is incurred for Federal income tax purposes. United States v. Anderson, 269 U.S. 422, 70 L. Ed. 347, 46 S. Ct. 131 (1926); sec. 1.461-1(a)(2), Income Tax Regs.
In applying the all events test, two separate and distinct requirements must be satisfied before petitioner may deduct the accrued monthly settlement payments: (1) All the events that bear on the fact of liability must have occurred, and (2) the *528 amount of liability must be determined with reasonable accuracy. United States v. Hughes Properties, Inc., 476 U.S. 593, 106 S. Ct. 2092, 90 L. Ed. 2d 569 (1986). Failure to satisfy either requirement is fatal to petitioner's claim. Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 634 (1980).
While respondent argues that the note was contingent, Universal No. 1's obligation to pay was fixed on the date of the contract whether or not the project was successful. This is not a case where payment would come only if A-40 were successful, cf. Waddell v. Commissioner, supra. Nor is it a situation where a nonrecourse note was used and the purchase price at the time of contracting was unreasonably inflated. See, e.g., Fox v. Commissioner, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). *529 [13] In this sense, then, the note was not contingent, but there is more to come. In Burnham Corp. v. Commissioner, supra, we further said: The purpose of the second requirement of the all events test is to prohibit deductions for liabilities that in fact exist but the amounts of which are based upon unrealistic estimates of future expenses. The amount of liability need not be determined exactly; the amount must be determinable *530 with "reasonable accuracy." Sec. 1.461-1(a)(2), Income Tax Regs. [Burnham Corp. v. Commissioner, supra at 958.]
On this latter point, Universal No. 1 must fail. At the time the note in question here was entered into, there was no doubt that the obligation to repay was fixed, but the amount thereof (in U.S. dollars) was uncertain and unascertainable. [14]
*531 As our findings of fact show, the obligation entered into by Universal No. 1 could be discharged beginning 7 years after 1982, either in U.S. dollars or in any one of five foreign currencies. In the 7 years intervening between the making of the note and the time for repayment, the amount by which those foreign currencies would fluctuate against the dollar was unknown. Although Universal No. 1 apparently contemplated that such foreign currencies would decline in value against the dollar, this was entirely speculative. There existed no method at the end of 1982 (and the parties have not suggested any) by which the amount of depreciation of the various foreign currencies could be determined 7 years in advance, so as to arrive at a reasonably accurate valuation of the dollars' worth of the promissory note at that time. Unlike the situation in Burnham Corp. v. Commissioner, supra, therefore, where the parties were in agreement that the amount of the obligation for future payment was determinable in the year the obligation was entered into, the amount in the instant case was entirely unknown, speculative, and contingent at the end of 1982. As our findings *532 of fact show, the first one-quarter payment on the alleged obligation of $ 2,625,000, entered into at the end of 1982, was satisfied in 1989 for the sum of $ 31, the amount necessary to buy the required amount of Brazilian currency, which was the cheapest of all the currencies which the note permitted Universal No. 1 to elect in order to satisfy its obligation. We accordingly hold that the promissory note could not be accrued and deducted in any amount by Universal No. 1 at the end of 1982, because the amount thereof was contingent and unascertainable. For this same reason, we hold that interest on the promissory note could not be accrued and deducted in any amount by Universal No. 1 or Universal No. 2 in any of the years before us. 4. Research and Experimental Expense--Section 174. The fourth issue that we decide is whether Universal No. 1 incurred research or experimental expenditures within the meaning of section 174. [15] While section 174 does not define the term "research or experimental expenditures," we have approved of the definition found in section 1.174-2(a)(1), Income Tax Regs., limiting the expenditures to "research and development costs in the experimental or *533 laboratory sense." Mayrath v. Commissioner, 41 T.C. 582, 590 (1964), affd. 357 F.2d 209 (5th Cir. 1966). Included in this definition are: all such costs incident to the development of an experimental or pilot model, a plant process, a product, a formula, an invention, or similar property, and improvement of already existing property of the type mentioned. [Sec. 1.174-2(a)(1), Income Tax Regs.]
In Agro Science Co. we stated that "The goal of the research must be scientifically reasonable, but research is more than repeating what has already been done." Agro Science Co. v. Commissioner, T.C. Memo 1989-687, 1989 Tax Ct. Memo LEXIS 687, 58 T.C.M. (CCH) 1093, 1102, T.C.M. (RIA) 89687 at 3551. Initially, respondent claims that the work done on A-40 through August 1983 did not qualify as research *534 or experimental expenditures because Omega's attempt to "search, find, and read" the license plate on the rear of an automobile was not scientifically reasonable. Respondent presented expert evidence and argues that if Omega and Universal No. 1 had done more research into the area, they would have realized that the project was not feasible because it required too much computer capacity. Section 174 does not limit deductions for expenditures to those which result in successful R&D projects. In addition, there is no indication in the statute that the deduction is available only if the taxpayer's investigation determines that success is probable. Prior to September 1983, Universal No. 1 was not merely purchasing another's process or product. Based on the facts and circumstances of this case we are not persuaded that expenditures for A-40 were scientifically unreasonable. Omega made investigations and believed A-40 was feasible. Respondent next argues that costs incurred by Omega after it abandoned its software approach in August 1983 were not deductible because Omega was merely "repeating what has already been done." See Agro Science Co. v. Commissioner, supra. In support, *535 respondent presented evidence that police officers in Germany were using hard-drive technology to catch speeders similar to that which Omega developed. We are not persuaded that A-40 was not an improvement on any foreign technology. See sec. 1.174-2(a)(1), Income Tax Regs. The German technology took 2 weeks to determine the characters on a license plate while A-40 took less than 5 seconds. Universal No. 1 incurred expenditures for the R&D of a project scientific in nature. The project involved unique processes, or the improvement of existing processes, which Omega reasonably believed could result in a patentable invention. While we make no intimations on how we would decide this issue if any of the facts were changed, or if the burden of proof were different, in the instant matter respondent has failed to persuade us that the costs actually incurred for the development of A-40 were not deductible under section 174, and having raised the issue by amended answer, the burden of proof was on him. Rule 142(a). Respondent next argues that the record does not show that Omega incurred $ 3,000,000 worth of research or experimental expenditures in developing A-40, and that Universal *536 No. 1 should therefore not be entitled to a section 174 deduction in that amount. We agree that the $ 75,000 used by Omega to pay Duncan for negotiating the R&D agreement was not deductible by Universal No. 1 under section 174. If Universal No. 1 had paid that amount to Duncan directly, Universal No. 1 would have had to capitalize it. The expense could not be transformed into a current deduction merely because Omega paid it. See sec. 1.174-2(a)(2), Income Tax Regs. As noted in the previous issue, we have also disallowed for all purposes the promissory note of $ 2,625,000. We believe that the $ 300,000 of cash which Universal No. 1 paid Omega to undertake development of A-40 was reasonable based on the facts known by the parties at the time of contracting. While Omega may have spent less than $ 300,000 in developing A-40, respondent has not persuaded us that this difference was anything other than Omega's compensation for undertaking the project's development on Universal No. 1's behalf. We need not determine whether this difference could have been deductible under section 162, since section 174 clearly contemplates that it was deductible under its provisions. See sec. 1.174-2(a)(3), *537 Example (1), Income Tax Regs. We hold that in 1982 Universal No. 1 incurred a $ 300,000 expense deductible under section 174. Based on the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Universal Research And Development Partnership No. 2, Jerome J. Barbera III, Mark S. Leboeuf Partners Other Than The Tax Matters Partner, docket No. 9894-88; Universal Research And Development Partnership No. 2, Jerome J. Barbera III, And Mark S. LeBoeuf Partners Other Than The Tax Matters Partner, docket No. 1729-89; and Universal Research And Development Partnership No. 1, Russell O. Ayo, Jr., Hofman Music, Inc. and Paul E. Palmer, Partners Other Than The Tax Matters Partner, docket No. 4329-89.↩
2. With the exception of Universal No. 2's taxable year 1985, the parties executed Consents to Extend the Time to Assess Tax Attributable to Items of a Partnership (Forms 872-P) for each of the years at issue. Each of the notices of FPAA involved herein was sent either within 3 years of the date on which the partnership return was filed or within the period covered by the extensions. In their petitions, petitioners each raised the issue of whether the notices of FPAA were timely. However, petitioners did not address this issue at trial or on brief. The extensions appear to be valid on their face. We find that petitioners have conceded this issue.↩
3. Adjustments designated "other" include various administrative expenses and organization fees, and a 1982 expense reported by Universal No. 1 for a guaranteed payment to partner.↩
4. All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
5. McDonald incorporated Omega after reviewing a prospectus on Coral Sociedade Brasileira de Pesquisas e Desenvolvimento Ltda. (Coral). For a more complete description of Coral see Agro Science Co. v. Commissioner, T.C. Memo 1989-687, affd. 934 F.2d 573↩ (5th Cir. 1991).
6. The note was to be prepaid from 70 percent of any royalties, rents, or license fees (passive income) or from the greater of 15 percent of gross sales or 50 percent of gross profits if Universal No. 1 engaged in its own manufacturing, sales, or exploitation activities (active income).↩
7. However, the agreement only gave the initial partner a 1-percent loss allocation during the partnership's first taxable year. Duncan also contributed cash and a promissory note for an additional 5.565-percent interest.↩
8. During the first 8 months of 1983, the foreign currencies designated in the promissory note devaluated more quickly than the parties anticipated. Omega requested and Universal No. 1 agreed to alter their agreements to allow prepayments for a successful project only in U.S. dollars, and to change Omega's right of first refusal in a permanent license to an option to acquire a permanent license for $ 15,000, plus additional royalties based upon applicable gross sales. The parties also agreed that prepayments would be made from 50 percent rather than 70 percent of any passive income and that if Omega exercised its option to acquire a permanent license, Universal No. 1 had an option to acquire 20 percent of its interest in the permanent license.↩
9. The changes in the contractual documents essentially coincide with the amendments made to the documents between Universal No. 1 and Omega. See supra↩ note 8.
10. Universal No. 1 also passed through a $ 30,000 deduction for a guaranteed payment to partner.↩
11. Between 1982 and 1989, the Brazilian Government twice changed its form of currency; new cruzados were being used in 1989.↩
12. We have considered the fact that the partners believed that they would receive an "8 to 1" tax benefit, i.e., an eight dollar deduction for every one dollar in cash laid out. Although the parties referred to an "8 to 1" tax benefit for both partnerships, we have also considered the fact that Universal No. 2 represented almost a 16 to 1 ($ 470,000 promissory note, $ 30,000 cash) tax benefit. Tax benefits are only one factor for our consideration that must be weighed on the basis of all the facts and circumstances.↩
13. The note here on its face is recourse. In his FPAA, respondent also determined that the note was not deductible under sec. 465. The parties did not address this issue on brief, and we deem it abandoned. We note that sec. 465 is not applicable if a note is recourse and the lender has no interest in the activity other than as a creditor. Sec. 465(a)(1), (b). Omega's interest in A-40 during the years at issue was limited to that of a creditor. Jackson v. Commissioner, 86 T.C. 492, 529 (1986), affd. 864 F.2d 1521↩ (10th Cir. 1989).
14. Petitioners argue that an obligation stated in foreign currency is reported for Federal tax purposes at the rate of exchange on the date incurred even though payment of the foreign currency purchase price is extensively deferred to a time when exchange rates have changed, citing Willard Helburn, Inc. v. Commissioner, 214 F.2d 815 (1st Cir. 1954), affg. 20 T.C. 740 (1953). Based on the facts in this case, we reject petitioners' argument because it does not realistically estimate future expenses. See Burnham Corp. v. Commissioner, 90 T.C. 953 (1988), affd. 878 F.2d 86↩ (2d Cir. 1989).
15. Having decided that Universal No. 2 was not in a trade or business within the meaning of sec. 174, Issue 2, supra↩, we need consider it no further herein.